THE ILLINOIS STATE TRUST COMPANY

*v.*

THE ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RY. CO.

*Opinion filed October 24, 1905.*

1. APPEALS AND ERRORS—*effect of general reversal and remandment.* A general reversal and remandment, without specific directions, abrogates the judgment of the lower court, and either party, on a re-trial, may introduce testimony the same as on an original trial, save that no proceedings can be had inconsistent with the legal principle announced in the opinion.

2. SAME—*general reversal is not res judicata as to facts on a second trial.* Reversal of a condemnation judgment and general remandment for new trial upon the ground that under the evidence then in the record the petitioner's railroad and the one purchased by it were parallel or competing lines is not *res judicata* of that question, so as to bar further proof tending to show such lines were not competing or parallel.

3. RAILROADS—*what facts should be considered in determining whether lines are parallel or competing.* In determining whether a railroad in Illinois purchased by a foreign corporation and the original railroad owned by such corporation are parallel or competing lines, within the meaning of the act of 1899, (Laws of 1899, p. 116,) the line which the local railroad company had power, under its charter, to construct, as well as the portion of the line constructed, must be considered.

4. SAME—*when railroads are not competing lines.* A foreign and a local railroad are not "parallel or competing lines" where the line of the former between the termini of the latter is much longer and more indirect, requiring a change of cars and ferrying, and where no through trains between those points are run on the foreign railroad, no through business solicited or encouraged and no terminal facilities provided for at one terminus of the local road, and no freight or passenger rates made to compete with the local road or the local competitors of the latter.

APPEAL from the County Court of St. Clair county; the Hon. JOHN B. HAY, Judge, presiding.

WISE & McNULTY, for appellant.

L. D. TURNER, FORMAN & WHITNEL, and MARTIN L. CLARDY, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a proceeding in the county court of St. Clair county by the appellee for the condemnation of a strip of land one hundred feet in width belonging to the appellant, lying along and adjoining the original right of way of the St. Louis Valley Railroad Company. The cause was in this court at a former term, (208 Ill. 419,) and we then reversed the judgment of said county court awarding condemnation of the said strip for the reason that the appellee company is a foreign corporation, and therefore without authority to exercise the power of eminent domain in this State unless so empowered by the act of the General Assembly approved April 21, 1899, (Laws of 1899, p. 116,) which enactment authorizes a foreign railroad corporation to purchase the property of a resident corporation of which such foreign corporation shall be in possession, and to exercise the powers, privileges and franchises of the corporation whose property has been so purchased, including the power of eminent domain, if that power is necessary to enable it to acquire real estate necessary for the betterment, maintenance, extension or operation of such railroad so purchased or for the con-

struction and maintenance of spurs, switches, side-tracks, etc., and we held that the appellee company was not then so empowered, for the reason said act further provided that it should not be construed to permit any railroad company to purchase any parallel or competing line of railroad in this State, and that it appeared from the proofs then in the record that the said St. Louis Valley Railroad Company, of which the appellee company claimed to be the owner by purchase in pursuance of the said act of April 21, 1899, and by virtue of which purchase it contended it acquired the right to condemn the property in question, was a parallel or competing line of railroad of the appellee company. The cause was reversed and remanded generally, and has been re-docketed in the said county court and again heard, and judgment entered fixing the compensation for the land to be taken and the damages to land not taken at a total sum of $7000 and awarding condemnation upon payment of said sum. This is an appeal prosecuted to reverse this latter judgment of condemnation.

On the hearing, after the remandment of the case, being the hearing from which this appeal is prosecuted, the trial court, over the objection of the appellant company, permitted the appellee company to introduce testimony for the purpose of proving that said St. Louis Valley railroad and the appellee railroad were not parallel and competing lines of railroad. The contention of the appellant company was that the judgment of reversal and remandment pronounced in this court on the former submission of the case was an adjudication of the question whether the said lines of railroad were parallel or competing lines, and that evidence directed to that question was inadmissible, for the reason the question had become *res judicata.* It is here urged the court erred in overruling this contention. The judgment entered in this court was, that the judgment entered in the county court on the former hearing should be reversed and that the cause should be remanded. The remanding order was with-

out any specific directions,—that is, was general. The effect of that judgment was to entirely abrogate the former judgment of the county court and to remand the cause to the county court for further proceedings precisely as if no trial had ever occurred, and on a rehearing to authorize either party to introduce testimony in the same manner as if the case had never before been tried, save that no proceedings should be had or taken inconsistent with the legal principles announced in the opinion rendered by this court. *Chickering* v. *Failes,* 29 Ill. 294; *Dinsmoor* v. *Rowse,* 211 id. 317.

The parties, at the last hearing in the county court, entered into a stipulation of facts, agreeing "that complainant is a railroad corporation organized under the laws of the States of Missouri and Arkansas; that the St. Louis Valley is a railroad corporation under the laws of the State of Illinois; that it is a partially constructed railroad from Valley Junction through the counties of St. Clair, Monroe, Randolph, Union and Alexander, a distance of one hundred and twenty miles to Gale, and also a branch from Gorham, in Jackson county, in an easterly direction, twenty-six miles to Busch, in Williamson county, Illinois; that petitioner, on the 30th day of April, 1903, was in possession of said railroad lines in this State belonging to the St. Louis Valley railway and owned all of the capital stock of said company; that said petitioner purchased in fee simple all of the said railroad of said company, together with all the rights, etc., used in connection therewith; that said sale and purchase were duly approved by the stockholders of the St. Louis, Iron Mountain and Southern Railway Company and of the St. Louis Valley railway, at meetings held upon notice given as required by law; that said petitioner complied with all the requirements of the State of Illinois with reference to doing business in the State of Illinois as a railroad company, and especially with the requirements of an act approved April 21, 1899, being section 218 of the Revised Statutes of Illinois of 1901; that the question to be determined in this

cause is whether the St. Louis Valley railway in Illinois and the St. Louis, Iron Mountain and Southern railway in Missouri are parallel or competing lines, or whether they will be if the Valley line shall be completed to Cairo, Illinois; that the other issue will be as to the amount of compensation to be paid by petitioner to defendant for the land actually taken and damages to the land not taken."

No complaint is made by either litigant as to the amount fixed by the judgment of condemnation to be paid as compensation for land taken and as damages to land not taken.

The record presents but a single question, and that a question of fact,—whether the line of railroad of the St. Louis Valley Railroad Company and that of the appellee company were parallel or competing lines of railroad. If so parallel or competing, the appellee company was without power to become the purchaser of the line of the Valley railroad, and the act of April 21, 1899, conferred no power on the appellee company to exercise the right of eminent domain in this State.

On the hearing in the county court when heard there for the first time, the only testimony on the question whether these lines of railroad were parallel or competing was that incidentally, rather than directly, given by two witnesses. No other witnesses then testified on the point. On the hearing in the county court which we are now called upon to review, twenty-two witnesses were produced and gave testimony in behalf of the appellee company. None were produced in behalf of the appellant company. These witnesses expressed it to be their opinon that the St. Louis Valley Railroad Company as constructed to Thebes, when purchased by the appellee company, and the line of the appellee company, were not parallel or competing lines of railroad, and testified to facts on which they, respectively, based the opinion so expressed, and would not be if the line of the Valley railroad should be completed to Cairo. Among these witnesses were two who had served as members of the Inter-State Commerce Com-

mission of the general government, and another was and had been the secretary of the said commission since its organization. Two others were members of the Railroad and Warehouse Commission of the State of Illinois, and two were ex-members of that commission. One other was a member of the Railroad Commission of the State of Missouri, and another was an ex-member of that commission. Among the other witnesses were large shippers of freight and grain, civil engineers, managers and superintendents and other officials of various systems of railroads. We have carefully read the testimony of all of these witnesses, and after a thorough consideration of all the facts and circumstances disclosed in their testimony and by the stipulation of facts, in connection with the geographical facts of which judicial notice is taken, we have reached the conclusion that said lines of railroad were neither parallel nor competing lines.

The St. Louis Valley Railroad Company was organized under the laws of this State, with authority to construct a railroad from Valley Junction, a point six miles south-east from East St. Louis, to the city of Cairo, with a branch road extending in a north-easterly direction from Gorham, a town nearly equi-distant between Valley Junction and Cairo, into the coal fields of Franklin and Williamson counties, in Illinois. The line of the Valley railroad authorized by its charter to be constructed from Valley Junction to Cairo was located east of the Mississippi river, in the counties in Illinois bordering on that river and in close proximity thereto. After the road had been completed on the line as so located from Valley Junction to Gorham, about ninety-two miles south from Valley Junction, the appellee company came into possession of the road and afterwards purchased the same and completed the railroad to a point near the town of Thebes, which is about twenty or twenty-two miles up the river from Cairo. The distance from Valley Junction to Cairo is about one hundred and forty-three miles. The

St. Louis Valley Railroad Company was granted chartered power to construct and operate a railroad to Cairo, and in determining whether the line of its road is either parallel to or competing with the line of appellee's railroad, the line which it possessed the power to construct and operate, as well as that portion of the line whereon a railroad has been built, enters into consideration. Between Valley Junction and the Union Station in St. Louis temporary arrangements have been effected by means whereof the trains on the Valley railroad are enabled to reach that station.

The main line of the railroad of the appellee company runs from St. Louis, in a southerly or south-westerly direction, to Texas. For some short distance out of St. Louis the line of the road is located near the west bank of the Mississippi river, but at Riverside it bears away from the river in a south-westerly course, and when as far south as Thebes the main line of the railroad is about fifty miles west of Thebes and is sixty to seventy miles from Cairo at the nearest point to that city. A branch line of appellee's road runs from this point so nearest to Cairo, to-wit, Poplar Bluffs, in Missouri, to Birds Point, in Missouri, on the west bank of the Mississippi river, some four miles below Cairo, and from there the trains of the appellee company are transported by ferry to Cairo. The ferry is operated by another railroad company, and the appellee company owns neither tracks nor terminal facilities at Cairo. Beginning on the main line of appellee's road at Bismark, Mo., which is forty-eight miles west of the Mississippi river, the appellee company has another branch line of railroad which runs to Belmont, on the west bank of the Mississippi river, some twenty-five or thirty miles south of Cairo. This branch line, at Delta, Mo., the nearest point to Thebes, the terminus of the Valley railroad as actually completed, is sixteen miles west of Thebes, and at Charleston, Mo., this branch line is about sixteen miles west of Cairo. At Charleston the branch line from Bismark to Belmont crosses the branch line from Poplar Bluffs to

Cairo.  The evidence shows that no through trains are or were ever run on appellee company's road between St. Louis and Birds Point.  Passengers could go from St. Louis to Birds Point by taking a train on the main line from St. Louis to Bismark and there alighting.  They could there take a train on the Belmont branch of appellee's road and alight therefrom at Charleston, from which point they could reach Birds Point by means of a train on the branch of appellee's road running between Poplar Bluffs and Birds Point. Freight would be transferred at the same point.  Passengers and freight from Birds Point to St. Louis would pass over the same route and by means of the same changes of trains.

It appeared from the proofs that the line of the road of the appellee company in Missouri, because of the bluffs of the river, followed along the river bank from St. Louis until it passed below the bluffs, and then left the river and ran off to the south-west and passed through the region of the Ozark mountains, where many curves and high grades are necessary; that this line is nearly fifty miles longer than the distance from Cairo to St. Louis on the Illinois side of the Mississippi river; that at Birds Point the means of crossing the Mississippi river, a distance of about four miles, is very inconvenient, controlled by other companies, and expensive. The maximum grade of appellee's road in Missouri runs, as was testified to by civil engineers, at one hundred feet to the mile.  On the Valley railroad the maximum grade is about thirteen feet to the mile, with but few or no curves, and the means of transferring passengers and freight at St. Louis are much superior and less dangerous and expensive than those at Birds Point.  The Illinois Central Railroad Company and the Mobile and Ohio Railroad Company each operate through lines of railway from Cairo to St. Louis.  These lines are direct, have superior facilities for crossing the river, and both roads operate through passenger and freight trains back and forth betwen Cairo and St. Louis.  These lines are shorter than the indirect route that must be taken on appel-

lee's lines of railway, and they are the competitors of each other, and of the boats on the river, for passengers and freight between Cairo and St. Louis. Under such circumstances it was entirely impracticable for the appellee company to attempt to compete for business either way between Cairo and St. Louis. Moreover, the proof shows that the appellee company did not attempt to compete for such business. It appeared the appellee company maintained an office in Cairo and that it published a tariff rate from Cairo to St. Louis, but the testimony showed that the office was maintained there for the purpose of soliciting freight and passenger business for points south-west of Cairo and the tariff of rates was published because the statutes so required. The general traffic manager of the appellee road testified that his instructions did not warrant their agent in Cairo to solicit business from that point to St. Louis; that the company did not solicit or encourage traffic either way between Cairo and St. Louis and had never done so; that the appellee company recognized that it was commercially impossible for it to compete with the Illinois Central and Mobile and Ohio railroads for business between those cities, and that the appellee company did not make a competing freight or passenger rate, or install through trains, or make any other effort to secure business between those cities. Representatives of the branch of the Illinois Central railroad from St. Louis to Cairo testified that that road was the competing line with the Mobile and Ohio railroad for Cairo and St. Louis business; that they did not regard, and had never regarded, appellee's road as a competitor; that in making rates for such business they would consult with the Mobile and Ohio railroad officials and agree with them, but never with the officials of the appellee road, as it took no business between those points worthy of consideration. The general manager of the Mobile and Ohio railroad testified that he had been in the service of that company for twenty-eight years, and during that time the appellee's road in Missouri was never consid-

ered as a factor in the traffic between Cairo and St. Louis; that never, to his knowledge, had any train left Cairo for St. Louis, or from St. Louis for Cairo, over the appellee's road; that an office was maintained by the appellee company in Cairo for the purpose of securing business for points in south-west Missouri, Arkansas and Texas. The vice-president of the appellee company testified that competition on the part of his road with the Illinois Central and Mobile and Ohio railroads between Cairo and St. Louis was practically an impossibility; that the branch of the appellee's line from Poplar Bluffs to Birds Point was constructed as a part of the southern system of its road for the purpose of securing and carrying to its main line freight and passengers at Cairo to be transferred to the south-west, and that the branch was of no importance or consequence whatever for business to St. Louis; that the office was maintained in Cairo to secure business for the south-west; that business from Cairo to St. Louis, or from St. Louis to Cairo, by way of the appellee's road was not and had not been sought for or expected and was too rarely heard of to be considered by the officers of the company, and was not considered at all as a source of income to the company. The agent employed by the appellee company to solicit freight and secure business for that road in Illinois testified that he solicited freight to go to points on appellee's road in Missouri; that he had no instructions to solicit freight for Cairo, and did not think that he ever got a shipment for Cairo; that the Illinois Central and the Mobile and Ohio railroads got all the business for that point; that the appellee company had no practical line for business to Cairo. Two witnesses who dealt largely in grain raised in Illinois near the bank of the Mississippi river testified that they shipped from St. Louis to Cairo by the Mobile and Ohio railroad, and never by the appellee's road. The evidence demonstrated that the appellee railroad is not and was never a competing line for business between Cairo and St. Louis or St. Louis and Cairo.

217—33

It was also as clearly shown that the Valley railroad, if completed no further than Thebes, would not be a competing line with that of the appellee company. Delta, Mo., on the Belmont branch of the appellee road, is the nearest point on any of appellee's lines to Thebes. The distance between these points is about twenty miles. The river and one of the lines of the Frisco system of railroads which runs along the western bank of the river to St. Louis, and a branch line of the Illinois Central railroad which for some distance above Thebes is located between the Valley railroad and the east bank of the river, are between Thebes and Delta. It is therefore apparent that competition does not and could not exist between the Valley railroad at Thebes and the appellee railroad at Delta, twenty miles away. Competition at Thebes for St. Louis business would be the steamers on the river and the line of the Frisco system on the opposite shore of the river, and that of the Illinois Central railroad before mentioned. From Delta the course of the Belmont branch of appellee's line is to the north-west, gradually increasing its distance from the river and from the line of the Valley railroad and of the Frisco system until it intersects with the main line of appellee's road at Bismark, about forty-eight or fifty miles west of the river. At Riverside, north of Bismark, the line of the appellee's road, in order to avoid bluffs and hills, draws nearer to the river, and from thence into St. Louis passes along the more level ground that lies between the bluffs and the river. From Riverside to St. Louis, a distance of from twenty-five to thirty miles, the line of appellee's road in Missouri and that of the Valley railroad in Illinois are more nearly together, being from six to eight miles apart, the river intervening, and for a portion of the way two or more railroads intervene on the Illinois shore. A grain dealer who lives at Kimmswick, Mo., about eight miles north of Riverside, testified that he had been in the grain business for about twenty years as a buyer and shipper of grain south of St. Louis on the Illinois side of the Mississippi river; that

he had eight elevators along the line of the Valley railroad in Illinois; that prior to the construction of the Valley railroad the grain in that portion of Illinois was shipped by boat, and that none of it was ever brought across the river for shipment on the appellee's line of road; that he was before the Valley railroad was built, and still is, a shipper of wheat from St. Louis to Cairo, but never made a shipment on the appellee's road and was never solicited to do so, although he did considerable business with the appellee road. Another grain buyer who lives at Waterloo, Illinois, testified that prior to the building of the Valley railroad the products from the farms along and near the Mississippi river south of St. Louis, in Illinois, went to market by the river; that it was practically impossible to take them across the river and to the appellee's road for shipment and that he never knew of any such products being so shipped; that the Valley railroad is the competitor of the river boats and other lines of railroads in Illinois for the shipment of the products of the farms along and near the line of the Valley railroad and the river, and that the appellee railroad in Missouri is not and never was a competitor for such trade.

It therefore very plainly appeared from all the testimony that the Valley railroad, at either terminus or at any intervening point, was not and is not a competing line of road with that of the appellee, and is not a parallel line of road either within the technical geometrical definition of the word "parallel," or within the more enlarged and practical meaning which, when the element of competition is present, should be given the term "parallel lines," as employed in the statute under consideration.

The judgment of the county court is correct, and is affirmed.                              *Judgment affirmed.*